**K&L GATES LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Fax:  (973) 848-4001
*Attorneys for Plaintiffs*
Hudson Hospital OPCO, LLC--d/b/a CarePoint Health--Christ
Hospital, IJKG, LLC, PROPCO LLC and IJKG OPCO LLC d/b/a
CarePoint Health--Bayonne Medical Center, and HUMC OPCO LLC
d/b/a CarePoint Health--Hoboken University Medical Center

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HUDSON HOSPITAL OPCO, LLC--d/b/a CAREPOINT HEALTH--CHRIST HOSPITAL, IJKG, LLC, IJKG PROPCO LLC and IJKG OPCO LLC d/b/a CAREPOINT HEALTH--BAYONNE MEDICAL CENTER, and HUMC OPCO LLC d/b/a CAREPOINT HEALTH--HOBOKEN UNIVERSITY MEDICAL CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> HORIZON HEALTHCARE SERVICES, INC. d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, <br><br> Defendant. | Hon. <br><br> Civil Action No. <br><br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiffs Hudson Hospital OPCO, LLC d/b/a CarePoint Health--Christ

Hospital ("Christ Hospital"), IJKG, LLC, PROPCO LLC and IJKG OPCO LLC

d/b/a CarePoint Health--Bayonne Medical Center (collectively, "BMC") and

HUMC OPCO LLC d/b/a CarePoint Health--Hoboken University Medical Center

("HUMC") (all plaintiffs collectively, the "CarePoint Hospitals"), by and through

their attorneys, K&L Gates LLP, for their complaint against defendant, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey ("Horizon") allege as follows:

## NATURE OF THE CLAIMS

1.      The CarePoint Hospitals' claims arise from Horizon's intentional and unlawful pattern of drastically underpaying and/or refusing to pay the CarePoint Hospitals for claims submitted to Horizon for reimbursement for medical treatment provided to patients when the CarePoint Hospital was out of network with Horizon.

2.      From June 1, 2015, through September 20, 2016, Horizon has underpaid the CarePoint Hospitals by more than seventy-six million, one hundred forty-three thousand, four hundred eighty and 82/100 dollars ($76,143,480.82) on claims for reimbursement, excluding claims under State Health Benefit plans.

3.      Horizon provides health care insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of health care benefit plans and policies of insurance, including employer-sponsored benefit plans and individual health benefit plans ("Plans").

4.      As shown further below, in violation of its duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*., and state law, Horizon has failed and refused to pay in full for health care services that the

CarePoint Hospitals provided to patients covered by the Plans provided or administered by Horizon ("Horizon Subscribers").

5.      Specifically, the CarePoint Hospitals provided hospital services in connection with seven thousand one hundred sixty-nine (7,169) patient visits by Horizon Subscribers as follows:

a.      During the period from June 1, 2015 to September 20, 2016, Christ Hospital provided hospital services relating to approximately four thousand five hundred fifty-eight (4,558) patient visits by Horizon Subscribers.  Of those patient visits:  two thousand four hundred thirteen (2,413) were for emergency/urgent care; and two thousand one hundred forty-five (2,145) were for non-emergency/non-urgent ("Elective") care within the scope of the out-of-network benefits provided under the patients' Plans.

b.      During the period from May 1, 2016 to September 20, 2016, BMC provided hospital services relating to approximately one thousand four hundred six (1,406) patient visits by Horizon Subscribers.  Of those patient visits: eight hundred sixty (860) were for emergency/urgent care; and five hundred forty-six (546) were for Elective care within the scope of the out-of-network benefits provided under the patients' Plans.

c.      During the period from June 1, 2016 to September 20, 2016, HUMC provided hospital services relating to approximately one thousand two

hundred five (1,205) patient visits by Horizon Subscribers.  Of those patient visits: seven hundred sixty (760) were for emergency/urgent care; and four hundred forty-five (445) were for Elective care within the scope of the out-of-network benefits provided under the patients' Plans.

6.     The CarePoint Hospitals' billed charges for these claims total approximately one-hundred forty-six million three hundred twenty-two thousand three hundred forty-eight and 15/100 dollars ($146,322,348.15), reflecting the CarePoint Hospitals' usual, customary, and reasonable rates for the particular medical services provided.  Assuming an average patient responsibility (*i.e.*, co-payments, co-insurance, and deductibles) under the applicable Plans of ten percent (10%) of the charges for emergency/urgent care and that Horizon is permitted under the Plans to pay only 325% of the applicable Medicare rates with respect to charges for Elective care, then Horizon is responsible for one hundred fifteen million seven hundred twenty-nine thousand forty-four and 59/100 dollars ($115,729,044.59) of the total charges.

7.     However, to date, Horizon has reimbursed the CarePoint Hospitals for only a small fraction of this amount—thirty-nine million five hundred eighty-five thousand five hundred sixty-three and 77/100 dollars ($39,585,563.77) or only thirty-four (34%).  The current unpaid balance due to the CarePoint Hospitals is approximately seventy-six million one hundred forty-three thousand four hundred

eighty and 82/100 dollars ($76,143,480.82) with respect to these seven thousand one hundred sixty-nine (7,169) claims.

8.    Because Horizon Subscribers continued to seek treatment at all the CarePoint Hospitals after September 20, 2016, the underpayment amounts continue to increase at the rate of approximately two hundred forty (240) patient visits per week (for all three CarePoint Hospitals combined) or an estimated four to six million dollars ($4-6 million) per week.

9.    Horizon's pattern of denying or dramatically underpaying the CarePoint Hospitals is in clear violation of the terms of the Plans, as well as federal and state law.

10.    For example, the CarePoint Hospitals, like all hospitals are prohibited by *Emergency Medical Treatment and Active Labor Act of 1986* (EMTALA), 42 U.S.C. §  1395dd from turning away women who are in active labor or any other persons in need of emergent/urgent medical treatment because of inability to pay or unavailability of insurance.  One of the claims at issue here arises from Christ Hospital providing medical services to a woman who was already in an advanced stage of labor when she arrived at Christ Hospital's emergency room late in the evening.  Due to concern for the fetus with nonreassuring fetal heart rate tracing and other complications, a cesarean delivery was performed and the patient's baby boy was delivered with the umbilical cord wrapped tightly around his neck.  Christ

Hospital's claim for reimbursement was denied by Horizon for the stated reasons that the patient "does not have out of network benefits as part of her policy," the "delivery was not emergent," and the patient could have been "transferred to a participating hospital within the time frame for her delivery."  Horizon's position that Christ Hospital should have turned this patient away and subjected her to the risks of being transported to another hospital while in an advanced stage of labor is clearly illegal and abhorrent to good medical practice and any sense of common decency and consideration for this patient's and her child's circumstances.

## THE PARTIES

11.     BMC is a privately held, limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 29th Street and Avenue E, Bayonne, New Jersey.

12.     Christ Hospital is a privately held, limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 176 Palisade Avenue, Jersey City, NJ 07306.

13.     HUMC is a privately held, limited liability company, organized under the laws of the State of New Jersey, with its principal place of business at 308 Willow Avenue, Hoboken, NJ 07030.

14.    Horizon is a not-for-profit health services corporation in the State of New Jersey, formed pursuant to the Health Services Corporation Act,  with its principal place of business at Three Penn Plaza East, Newark, New Jersey.

15.    Horizon is in the business of providing health benefit plans and policies of health insurance.  According to Horizon, it provides benefits under a variety of health benefit plans, including individual health benefit plans and group plans, including employer-sponsored plans and government-sponsored health benefit plans.

16.    Horizon is the only health services corporation in New Jersey.  It is declared by statute, N.J.S.A. 17:48E-41, to be a charitable and benevolent institution exempt from all New Jersey taxes except real property taxes and the tax on insurance premiums.  It is required by statute, N.J.S.A. 17:48E-3(a), to be operated for the benefit of its subscribers.

17.    Although declared by statute to be a non-profit, charitable organization, Horizon has generated enormous profits and accumulated, as of December 31, 2014, capital reserves of $2.81 billion.

18.    Horizon is the largest private health insurer in New Jersey, with a more than 50% share of the state's commercial market.  Horizon has stated that it insures approximately 2.1 million lives through its commercial products.  Horizon administers the State Health Benefits Program, which includes approximately

750,000 insured lives.  In total, including Medicare, Medicaid, and governmental

employee coverage, Horizon provides health insurance to approximately 3.8

million people in New Jersey.

## JURISDICTION AND VENUE

19.    This Court has federal question subject matter jurisdiction over this

matter pursuant to 28 U.S.C. § 1331, as the CarePoint Hospitals assert claims

against Horizon, in Counts One, Two, and Three, under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*.

20.    This Court also has supplemental jurisdiction over the CarePoint

Hospitals' state law claims against Horizon, in Counts Four through Nine, because

these claims are so related to the CarePoint Hospitals' federal claims that the state

law claims form a part of the same case or controversy under Article III of the

United States Constitution.  The Court has supplemental jurisdiction over these

claims pursuant to 28 U.S.C. § 1367(a).

21.    This Court has personal jurisdiction over Horizon because Horizon is

incorporated and has its principal place of business in New Jersey and carries on

one or more businesses or business ventures in this judicial district; there is the

requisite nexus between the business(es) and this action; and Horizon engages in

substantial and not isolated activity within this judicial district.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) (2), because a substantial portion of the events giving rise to this action arose in this District.

## GENERAL ALLEGATIONS

### A.   The CarePoint Hospitals

23.     BMC is a 278-bed, fully accredited, acute care hospital that provides quality, comprehensive, community-based health care services to more than 70,000 people annually.  Its facilities include 19 full-service emergency room bays, 205 medical/surgical beds, 10 obstetrical beds, 17 pediatric beds, 14 adult ICU/CCU beds, and 15 adult, acute psychiatric beds.  The service complement consists of six inpatient operating rooms, two cystoscopy rooms, one full-service cardiac catheterization lab, 12 chronic hemodialysis stations, one MRI unit, emergency angioplasty services, elective angioplasty, two hyperbaric chamber units, and a PET-CT diagnostic imaging unit.

24.     Christ Hospital is a 376-bed fully accredited acute care hospital.  With a highly-qualified medical team — including more than 500 doctors with specialties ranging from allergies to vascular surgery — Christ Hospital offers a full spectrum of services and has been recognized for excellence in cardiovascular, respiratory, and newborn care.  As a state-certified Stroke Center and Primary Angioplasty Center, Christ Hospital provides lifesaving emergency interventions

with outcomes that rank among the best in New Jersey.  Christ Hospital is

affiliated by common ownership with the principal owners of BMC.

25.     HUMC is a 333-bed fully accredited general acute care hospital.

HUMC provides advanced medical technologies in support of its medical staff,

nursing team, and other caregivers, to enable state-of-the-art care to citizens of

Hoboken and the surrounding communities.  HUMC offers excellence in

emergency medicine in the 34-bay emergency room and the dedicated OB/GYN

ED; inpatient rehabilitation; transitional care; child and adult behavioral health;

women's care; wound care; and numerous surgical subspecialties.  The American

Heart and Stroke Association awarded the Silver Award to HUMC for its

dedication to improving quality of care for stroke patients.  Overall, HUMC was

ranked in the top ten hospitals in New Jersey for care quality among all hospitals in

the state with 350 beds or fewer.  HUMC is also affiliated by common ownership

with the principal owners of BMC.

26.     Between 2008 and 2012 each of the CarePoint Hospitals was

purchased out of bankruptcy by the current owners.  The owners then invested

substantial time, effort and capital into improving the hospitals' finances, physical

plant, equipment and overall quality of the healthcare services they provide.  For

example, the CarePoint Hospitals' actual and projected capital expenditures for the

years 2014-2017 total $117.8 million, of which $5.1 million relates to equipment

purchases and $97.9 million relates to construction and renovation of facilities.  In addition, the CarePoint Hospitals' annual operating expenditures total several hundred million dollars, *e.g.* $384 million in operating expenditures in 2014.

27.     Setting aside the immeasurable benefit of improved health care for the patient communities, the new owners' efforts to rescue these hospitals from bankruptcy have generated huge economic benefits to Hudson County and the State.  The economic impacts for New Jersey of the CarePoint Hospitals' estimated annual in-state operating expenditures of $384 million and capital expenditures of $117.8 million include:

a.   8,167 direct and indirect jobs or job-years (one job lasting more than one-year);

b.   $815.2 million in gross domestic product;

c.   $653.9 million in compensation;

d.   $23.5 million in state government revenues; and

e.   $8.7 million in local government (county, municipal, school district) revenues outside Hudson County.

28.     The CarePoint Hospitals currently operate as for-profit hospitals.  As such, they are not eligible for tax exempt status as charitable organizations and they receive no federal or state subsidies.

29.     The CarePoint Hospitals also receive no federal or state government reimbursement for patients who are undocumented citizens, the vast majority of whom are treated at urban hospitals.  The hospitals may be able to obtain partial

payment for undocumented patients who agree to file a charity application, but many resist out of fear of deportation.

30.     The CarePoint Hospitals are also paid far less than their costs for services provided to Medicare, Medicaid and Charity Care patients.  For example, at BMC, Medicaid only covers 66 percent of its costs and only 29 percent of its charity care costs for those who qualify.  For care provided to uninsured patients whose gross income is less than 500 percent of the federal poverty level, hospitals are required to limit charges at the rate of 115% of Medicare (and still below costs) but the majority of these uninsured patients still do not pay anything on that reduced amount.

31.     In 2015, for all CarePoint Hospitals combined, the uninsured, charity care, and Medicaid patients comprised:

    a.    60.3 percent of all emergency room visits;
    b.    45.1 percent of all other outpatient visits; and
    c.    40.5 percent of admissions.

32.     The percentages for charity care, Medicaid and uninsured patients at the individual hospitals during 2015 were as follows:

| Charity Care, Medicaid, Uninsured Patients 2015 | | | |
|---|---|---|---|
| | BMC | Christ | HUMC |
| Admissions | 22.2% | 50.1% | 44.3% |
| ER Visits | 55.1% | 66.0% | 57.0% |
| All Other Outpatient | 24.5% | 42.2% | 61.8% |
| Combined, Charity Care, Medicare, Uninsured | 33.6% | 48.8% | 59.0% |

33.    In contrast, patients who had commercial insurance represented much smaller percentages of the patients treated at the CarePoint Hospitals in 2015.

| Commercially Insured Patients 2015 | | | | |
|---|---|---|---|---|
| | | BC/BS | Other | Total |
| BMC | | | | |
| | Admissions | 10.2% | 4.5% | 14.7% |
| | ER Visits | 15.5% | 10.1% | 25.6% |
| | All Other Outpatient | 21.3% | 5.8% | 27.1% |
| | | | | |
| Christ Hospital | | | | |
| | Admissions | 6.1% | 5.3% | 11.4% |
| | ER Visits | 7.1% | 7.2% | 14.3% |
| | All Other Outpatient | 5.7% | 25.5% | 31.2% |
| | | | | |
| HUMC | | | | |
| | Admissions | 12.4% | 8.8% | 21.2% |
| | ER Visits | 12.0% | 12.0% | 24.0% |
| | All Other Outpatient | 7.9% | 2.9% | 10.7% |

34.    The CarePoint Hospitals and the independent physicians attending to patients at the hospitals are required by law to provide emergency/urgent care to any patient regardless of the patient's ability to pay and regardless of source of insurance payment.  A patient's ability to pay in no way affects or impedes the CarePoint Hospitals' delivery of emergency health care.

**B.    The CarePoint Hospitals' Out-of-Network Status**

35.    Health care providers are either "in-network" or "out-of-network" with respect to insurance carriers.  "In-network" or "participating" providers are

those who contract with health insurers that require them to accept discounted negotiated rates as payment in full for covered services.

36.   "Out-of-network" or "non-participating" providers are those that do not have contracts with insurance carriers to accept discounted rates and instead set their own fees for services based on a percentage of charges.

37.   Christ Hospital, BMC and HUMC were formerly in-network providers with Horizon but became out-of-network providers as to Horizon on June 1, 2015, May 1, 2016, and June 1, 2016, respectively.

38.   New Jersey law does not specify how a hospital's out-of-network charges must be determined.  Rather, under New Jersey law, hospitals are permitted to set charges for various services and products as they see fit.  N.J.S.A. 26:2H-18.51.  Moreover, courts lack authority to review and adjust a hospital's set charges under New Jersey law.  DiCarlo v. St. Mary Hospital, 530 F.3d 255 (3d Cir. 2008); Matter of Final Agency Decision by New Jersey Dep't of Health Regarding Utilization and Quality Review for Calendar Year 1993, 273 N.J. Super. 205, 226 (App. Div. 1994).

39.   The CarePoint Hospitals have been and remain willing to again become in-network providers with Horizon provided that Horizon is willing to provide in-network rates that would be sufficient to allow the hospitals to sustain themselves, meet their continuing obligations to provide community access to

quality healthcare services, and generate a reasonable profit.  To date, however, the CarePoint Hospitals have been unable to negotiate sustainable in-network rates with Horizon.

40.    Notably, all three of the CarePoint Hospitals were previously forced to seek bankruptcy protection because of inadequate in-network arrangements. BMC, HUMC and Christ Hospital were purchased out of bankruptcy by their current owners in 2008, 2011 and 2012, respectively.  During the first twelve months after acquiring BMC and as a necessary step to negotiate more adequate in-network arrangements, the current owners terminated BMC's then existing in-network agreements with 20 insurers, including Horizon.

41.    Horizon retaliated not only by refusing to reimburse BMC fully for medical services provided to Horizon Subscribers at out-of-network charges but also by filing a lawsuit against BMC (the "2009 Lawsuit").  In the 2009 Lawsuit, Horizon alleged, *inter alia*, that BMC knowingly submitted false insurance claims to Horizon in violation of the New Jersey Insurance Fraud Prevention Act ("IFPA"), and engaged in common law fraud, negligent misrepresentation, and tortious interference.  BMC filed counterclaims arising out of Horizon's pattern of grossly under-reimbursing BMC for the services it provided to Horizon Subscribers, attempting to steer patients away from BMC, and refusing to reimburse BMC for more than $100 million for medical services BMC provided to

Horizon Subscribers.  These counterclaims included claims arising under New Jersey's insurance coverage and payment mandates; claims arising under the benefit plans underwritten or administered by Horizon for which BMC held valid assignments of benefits; and claims for tortious interference, defamation, and injurious falsehood.

42.     By September 2011 and after two years of costly litigation, Horizon's claims were dismissed with prejudice and BMC's counterclaims were the only remaining claims to be resolved.  At that point, BMC and Horizon entered into a Settlement Agreement that resolved BMC's counterclaims, which by that time totaled in excess of $110 million, and also established terms under which BMC would operate as a Horizon in-network provider for 4 years.  Those same rates were later incorporated into in-network agreements between Horizon and HUMC and Christ Hospital that were in effect when those two hospitals were purchased out of bankruptcy in 2011 and 2012, respectively.

43.     The in-network agreements with Horizon are evergreen contracts that will automatically renew at essentially the same rates (with some rates adjusted based on the consumer price index).  As a result, to obtain any increase over the auto-renew rates, the hospital must first issue a notice to terminate the agreement.

44.     After acquiring Christ Hospital, it soon became apparent that the rates under the in-network agreement with Horizon were not adequate to meet Christ

Hospital's costs.  In fact, the three CarePoint Hospitals have vastly different cost structures.  As a result, there are significant differences in the reimbursement rates paid to the three hospitals under various government programs.  The fact that the hospitals have substantially different cost structures and reimbursement rates under government programs was necessarily known to Horizon at the time it proposed and obtained the consent of the new owners to apply the same rates to all three hospitals.

45.     Although the rates were not adequate to meet its costs, Christ Hospital honored the in-network agreement and accepted those rates until the time it was able to issue a notice of termination and begin the process of negotiating new rates for the renewal agreement that would fairly meet its costs and sustain the viability of the hospital.

46.     Because Horizon refused to negotiate new rates that were anywhere near sustainable rates, Christ Hospital was forced out-of-network with Horizon on June 1, 2015.

47.     As the in-network agreements with Horizon for BMC and HUMC were nearing the end of their initial 4-year terms, those hospitals also issued notices of termination in order to commence negotiations of new rates.  Thereafter, comprehensive contract renewal negotiations were conducted as to all three hospitals but Horizon again refused to offer new rates that would sustain the

viability of each hospital.  As a result, BMC and HUMC were also forced out-of-network with Horizon as of May 1, 2016, and June 1, 2016, respectively.

48.     As soon as each of the CarePoint Hospitals became out-of-network, Horizon immediately reinstituted its practice of unlawfully underpaying and refusing to pay the hospitals for health insurance claims, as Horizon had done when BMC went out-of-network in 2009.

**C.     The CarePoint Hospitals' Out-of-Network Status is Well Known to Patients and the Public.**

49.     The CarePoint Hospitals prominently advise their patients and the public of their out-of-network status.  The hospitals' websites currently direct patients to a webpage that lists the insurers with whom the hospitals are in-network and explains the difference between in-network and out-of-network providers, and how the hospitals bill insurers and patients.

50.     The CarePoint Hospitals' Insurance Help Desk is available to answer questions from patients and their billing department is available to explain and review a patient's bill, and discuss payment options.

51.     The CarePoint Hospitals also direct patients to contact their carrier to understand their out-of-network benefits.

**D.     Horizon Subscribers Regularly Seek Treatment at the CarePoint Hospitals for which Horizon Must Reimburse Plaintiffs under the Terms of its Plans and State Emergency Care Mandates.**

52.     As noted above, since June 1, 2015, the CarePoint Hospitals have provided hospital services to Horizon Subscribers in connection with approximately seven-thousand one hundred sixty-nine (7,169) patient visits to a CarePoint Hospital when it was out of network with Horizon.

53.     Upon information and belief, all of the Plans require Horizon to reimburse the CarePoint Hospitals for their total billed charges, less applicable in-network patient responsibility, for emergency/urgent care that the CarePoint Hospitals provide to Horizon Subscribers.

54.     Moreover, many of the Plans covering Horizon Subscribers specifically provide "out-of-network" benefits for services rendered by out-of-network hospitals, such as the CarePoint Hospitals.  These Plans require Horizon to reimburse the CarePoint Hospitals for Elective care that the CarePoint Hospitals provide to Horizon Subscribers at the usual, customary, and reasonable rates for such Elective care.  The Horizon Subscribers are responsible for the balance, if any, of CarePoint Hospitals' billed charges for such Elective care.

55.     Importantly, patients pay significantly higher health care premiums in order to have access to out-of-network medical providers.  Patients pay the higher

premiums to ensure that they will be able to obtain necessary medical services

from the medical providers and medical facilities of their choice.

56.     Further, New Jersey law requires that hospitals provide

emergency/urgent care to all patients, regardless of ability to pay.  This "take-all-

comers" statute mandates that "[n]o hospital shall deny any admission or

appropriate service to a Patient on the basis of that Patient's ability to pay or source

of payment."  N.J.S.A. § 26:2H-18.64.  Violation of this provision subjects a

hospital to a civil penalty of $10,000 for each violation.

57.     New Jersey regulations mandate that a hospital provide an appropriate

medical screening examination to all individuals who come to an emergency

department with what they believe to be an emergent or urgent condition.  N.J.A.C.

§ 8:43G-12.7(c).

58.     To ensure access to emergency care regardless of a patient's type of

insurance, New Jersey law requires healthcare insurers to specifically notify their

subscribers that they are entitled to have "access" and "payment of appropriate

benefits" for emergency conditions on a "24 hours a day" and "seven days a week"

basis.  N.J.A.C. § 11:24A-2.5(b) (2).

59.     New Jersey law also provides that an insurance carrier must pay for

the services provided by the hospital and do so promptly.  This process begins with

the requirement that the insurance carrier acknowledge receipt of all claims within

two (2) working days, if the claim is submitted electronically, or within fifteen (15)

working days, if the claim is submitted by way of written notice.  See N.J.S.A. §

17:48E-10.1(d) (1).

60.    New Jersey law provides that an insurance carrier must pay claims

within thirty (30) days after the insurance carrier receives the claim when

submitted electronically, or forty (40) days after received non-electronically,

provided the following conditions apply:

> (a)    the health care provider is eligible at the date of service;
>
> (b)    the person who received the health care service was covered on the date of service;
>
> (c)    the claim is for a service or supply covered under the health benefits plan;
>
> (d)    the claim is submitted with all the information requested by the payer on the claim form or in other instructions that were distributed in advance to the health care provider or covered person in accordance with the provisions of section 4 of P.L.2005, c. 352 (C.17B:30-51); and
>
> (e)    the payer has no reason to believe that the claim has been submitted fraudulently.

Id. § 17:48E-10.1(d) (1) (a)-(e)

61.    Accordingly, when a nonparticipating provider – for example, an out-

of-network hospital – receives an assignment of the right to payment from a

covered person, the insurance carrier is required by law to pay the hospital.  See

N.J.S.A. § 17:48E-10.1(d) (1).

62.     An insurance carrier's dispute of a portion of the claim does not excuse the carrier from payment of the entire claim:  "(4) Any portion of a claim that meets the criteria established in paragraph (1) of this subsection shall be paid by the payer in accordance with the time limit established in paragraph (1) of this subsection."  Id. § 17:48E-10.1(d) (4).  Horizon has not disputed any portion of the CarePoint Hospitals' claims but simply chose not to pay the full amount of the claims.

**E.     The CarePoint Hospitals Receive Complete Assignments of Benefits under Horizon Plans for Treatment Provided to Horizon Subscribers.**

63.     While out-of-network with Horizon, each CarePoint Hospital  had no contract with Horizon setting forth the terms under which Horizon would pay for services that the CarePoint Hospital provide to patients who are Horizon Subscribers.

64.     Rather, as out-of-network providers the CarePoint Hospitals provide healthcare services to all persons, including, but not limited to, those persons whose Plans allow them to receive services from providers who do not participate in their respective carrier's insurance network.

65.     Under the terms of most Plans that provide coverage for out-of-network care, a patient is responsible for the payment of "coinsurance," a percentage of the out-of-network provider's charge for which the patient is responsible.

- 22 -

66.     Upon registration at a CarePoint Hospital, all patients, including

Horizon Subscribers, execute a form titled "Assignment of Insurance

Benefits/Direct Payment/Authorized Representative/Agent" (the "AOB Contract"),

among other documents.  In the AOB Contract, Horizon Subscribers assign to the

CarePoint Hospital their rights to benefits under Horizon's Plans.

67.     These AOB Contracts provide for the assignment to the CarePoint

Hospital of all rights, benefits, and causes of action under a Horizon Plan:

> I hereby assign to the Hospital, all of my rights, benefits,
> privileges, protections, claims, causes of action, interests or
> recovery, to any and all rights, benefits, privileges, protections,
> claims, causes of action, interests, or recovery of any type
> whatsoever receivable by me or on my behalf arising out of any
> policy of insurance, plan, trust, fund, or otherwise providing
> health care coverage of any type to me (or to any other third
> party responsible for me) for the charges for services rendered
> to me by the hospital.  This includes, without limitation, any
> private or group health/hospitalization plan, automobile
> liability, general liability, personal injury protection, medical
> payments, uninsured or underinsured motor vehicle benefits,
> settlements/judgments/verdicts, self-funded plan, trust, workers
> compensation, MEWA, collective, or any other third-party
> payor providing health care coverage of any type to me (or to
> any other third party responsible for me) for the charges for
> services rendered to me by the hospital [collectively, "Coverage
> Source"].  **This is a direct assignment to the Hospital of any
> and all of my rights to receive benefits arising out of any
> Coverage Source**.  I understand that this assignment of benefits
> is irrevocable.  This assignment of benefits fully and
> completely encompasses any legal claim I may have against
> any Coverage Source, including, but not limited to, my rights to
> appeal any denial of benefits on my behalf, to request and
> obtain plan documents, to pursue legal action against any

coverage source, and/or to file a complaint with the New Jersey Department of Banking and Insurance.

68. The AOB Contracts also provide for payment of any benefits directly to the CarePoint Hospital:

> I authorize and direct payment be made by any and all coverage source directly to the hospital of all benefits, payments, monies, checks, funds, wire transfers or recovery of any kind whatsoever from any coverage source. I also agree to assist the hospital in pursuing payment from any coverage source. This includes, without limitation, signing documents requested or needed to pursue claims and appeals, getting documents from coverage source, or otherwise to support payment to the hospital.

69. The AOB Contracts also provide for the CarePoint Hospital to act as the Horizon Subscriber/Patient's authorized agent and representative to pursue actions to recover benefits under a Horizon Plan:

> I hereby authorize and designate the Hospital as my authorized agent and representative to act on my behalf with respect to all matters related to all of my rights, benefits, privileges, protections, claims, causes of action, interests or recovery arising out of any Coverage Source. This includes, without limitation, the Hospital requesting verification of coverage/pre-certification/authorization, filing pre-service and post-service claims and appeals, receiving all information, documentation, summary plan descriptions, bargaining agreements, trust agreements, contracts, and any instruments under which the plan is established or operated, as well as receiving any policies, procedures, rules, guidelines, protocols or other criteria considered by the coverage source, in connection with any claims, appeals, or notifications related to claims or appeals.

70.     These AOB Contracts provide, in part, that the patient is responsible

for the payment of coinsurance and other charges not paid by the patient's Plan:

> I understand that I am financially and legally responsible for
> charges not covered in full by the assignment of benefits …,
> including, but not limited to, any deductibles, copayments, and
> coinsurance amounts provided under any coverage source; and
> charges for which there is no Coverage Source.

**F.     Horizon Drastically and Unlawfully Underpays the CarePoint
Hospitals' Reimbursement Claims.**

71.     During the period from June 1, 2015 to September 20, 2016, the

CarePoint Hospitals, as out-of-network providers, rendered medical services in

connection with approximately seven thousand one hundred sixty-nine (7,169)

patient visits by Horizon Subscribers (excluding patients insured under State

Health Benefit plans).  The CarePoint Hospitals promptly filed claims with

Horizon for reimbursement for the medical services provided to these Horizon

Subscribers.

72.     The CarePoint Hospitals' total billed charges for these claims were

approximately $146.3 million, reflecting the CarePoint Hospitals' usual,

customary, and reasonable rates for the particular medical services provided.  The

$146.3 million in total charges is comprised of $116.6 million in charges for

emergency/urgent care and $29.7 million in charges for Elective care.

73.     The charges billed by the CarePoint Hospitals were especially

reasonable, *inter alia*, in light of the hospitals' costs and the low percentage of the

hospitals' patients who are insured by commercial insurance carriers, yet the hospitals must provide emergency care to any patient regardless of the patient's ability to pay and regardless of source of insurance payment.

74.     Horizon is responsible for the total charges except for the amounts for which the patient is responsible under the Plans (*e.g.*, deductible, co-pays, and coinsurance).

75.     With respect to the $116.6 million total charges for emergency/urgent care, the patient responsibility on average is less than ten percent (10%).  Even assuming, conservatively, that the patient responsibility averages a full ten percent (10%), Horizon is responsible for the remaining 90% or approximately $105.0 million.  However, to date, Horizon has reimbursed the CarePoint Hospitals for only a small fraction of that amount—$32.3 million or approximately thirty percent (30%)—leaving a balance due to the CarePoint Hospitals as of September 20, 2016 of approximately $72.7 million with respect to charges for emergency/urgent care.

76.     With respect to the $29.7 million total charges for Elective care, Horizon has generally calculated its responsibility under the Plans in amounts representing approximately three hundred twenty five percent (325%) of each CarePoint Hospital's applicable Medicare rates.  Applying those percentages, Horizon is responsible for at least $10.7 million but Horizon has paid only part of

that amount — $7.3 million or sixty eight percent (68%)—leaving a balance due to the CarePoint Hospitals as of September 20, 2016, of approximately $3.5 million with respect to charges for Elective care.

77.     With respect to all of the CarePoint Hospitals' total charges of $146.3 million for both emergency/urgent care and Elective care, Horizon is responsible for approximately $115.7 million but has paid only part of that amount— $39.6 million or approximately thirty-four percent (34%)—leaving a balance due to the CarePoint Hospitals as of September 20, 2016,of approximately $76.1 million with respect to the total charges for both emergency/urgent care and Elective care provided to Horizon Subscribers.

78.     Exhibits 1 through 5, which are attached hereto and incorporated herein by reference, are spreadsheets detailing the following information relating to the non-payments and underpayments by Horizon for the 7,169 claims submitted by the CarePoint Hospitals for emergency/urgent care and Elective care provided to Horizon Subscribers by the CarePoint Hospitals as out-of-network providers with Horizon through September 20, 2016:

        a.  Exhibit 1 provides a summary, for all CarePoint Hospitals combined, of the total charges, total receipts, total adjustments, and outstanding amounts due for all claims, broken down by claims relating to emergency/urgent care

(designated as "ER" or "Emergency") and non-emergency/elective care (designated as "Elective").

      b.  Exhibits 2 through 4 provide as to Christ Hospital, BMC, and HUMC, respectively, each hospital's total charges, total receipts, total adjustments, and outstanding amounts due for all claims, broken down between ER and Elective.

      c.  Exhibit 5 provides claim-specific information as to each of the claims, including the Facility, Account Number, Admit Date, Discharge Date, IPOP Flag (inpatient/outpatient/same day service), Service Type, Total Charges, Total Payments, and Policy Number.  Because Exhibit 5 contains information regarding medical treatment provided to specific patients (although patient names and other personal identifiers were excluded), the CarePoint Hospitals will request that Exhibit 5 be filed under seal.

## G.    Horizon Violates the Terms of the Applicable Plans.

79.    Upon information and belief, Plans containing out-of-network benefits require reimbursement of medical expenses incurred by Horizon Subscribers at usual, customary, and reasonable rates.

80.    The CarePoint Hospitals' total billed charges reflect their usual, customary, and reasonable rates for the particular medical services provided.  The amounts paid by Horizon (even after factoring in amounts that Horizon contends are the patients' responsibility under the applicable Plans, *e.g*., co-payments, co-

insurance, and deductibles) fall far short of the usual, customary, and reasonable reimbursement rates required under the Plans.

81.     Significantly, Horizon Subscribers who seek treatment at CarePoint Hospitals pay higher premiums, at times substantially higher premiums, for the right under the Plans to receive medical treatment from the provider of their choice, including from out-of-network providers such as the CarePoint Hospitals. The Horizon Subscribers bargain for and expect that payment will be made at the providers' usual, customary, and reasonable rates.  Horizon's practice of paying the CarePoint Hospitals a mere 23% of these rates for the rendering of medical treatment for Horizon Subscribers falls far below these reasonable expectations.

82.     Upon information and belief, Horizon acted as the Plan administrator and as fiduciary to the Horizon Subscribers for each of the claims at issue in this case.  Horizon exercised discretion, authority, control and oversight in determining if Plan benefits would be paid and the amounts of Plan benefits that would be paid. Horizon's improper administration of these claims resulted in the payment of a mere 30% of the usual, customary, and reasonable rates for the medical services rendered.

**H.     Horizon Violates Its Obligations Under the Emergency Care Mandate.**

83.     Under state and federal law, Horizon is legally obligated to pay for emergency/urgent care services rendered to Horizon Subscribers in an amount

sufficient to ensure that the Horizon Subscriber has no obligation to the CarePoint Hospitals beyond what the Horizon Subscriber would have to pay if the CarePoint Hospitals were part of Horizon's network.  *See, e.g. Aetna Health, Inc. v. Srinivasan*, 2016 N.J. Super. Unpub. LEXIS 1515 (App. Div., June 29, 2016). Horizon reaffirms this obligation in member handbooks, benefit booklets, and similar documents provided to Subscribers.  Horizon regularly fails and refuses to comply with this requirement.

84.    The CarePoint Hospitals submitted to Horizon claims totaling $116.6 million for reimbursement of emergency/urgent care provided to Horizon Subscribers through September 20, 2016.  Horizon has paid only $32.3 million on account of those claims or only 28% of the total amount of the claims.

85.    Upon information and belief, it is Horizon's general business practice not to pay fully out-of-network providers' charges for emergency/urgent care. Instead, Horizon pays a lesser amount by (a) multiplying the applicable Medicare rates by a percentage which is unilaterally and arbitrarily selected by Horizon and may range anywhere from 150% to 325% ; or (b) multiplying Horizon's in-network rates by a percentage which is unilaterally and arbitrarily selected by Horizon.  Using the amounts so calculated, instead of the provider's charges, Horizon then applies the in-network level of benefits under the Plan.

86.     Horizon's practice of underpaying claims for emergency care provided by out-of-network providers is not only contrary to law but also contrary to what BlueCross Blue Shield insurers in other states ("BCBCS Insurers") regularly pay the CarePoint Hospitals.  When the CarePoint Hospitals provide emergency/urgent care to patients who have coverage with BCBS Insurers, the CarePoint Hospitals' claims for reimbursement pass through the local plan (Horizon) but they are submitted to the responsible home plan BCBS Insurer (*e.g.,* Anthem Blue Cross, or Capitol Blue Cross).  Unlike Horizon, the out of state BCBS Insurers process and pay the claims in compliance with their obligation to assure that their subscribers pay no more that they would have paid for the same care at an in-network hospital.  None of those BCBS Insurers process such claims based upon a unilaterally and arbitrarily chosen percentage of Medicare or in-network rates.

I.      **Other Improper Actions By Horizon To Delay Payment And/Or Refuse To Comply With Its Obligations Under The Plans And The Emergency Care Mandates.**

   **a**.  **In-Hospital Denials and Downgrades**

87.     When a patient presents at a CarePoint Hospital for emergency/urgent care, the hospital will ordinarily obtain the patient's insurance information (if any), notify the patient's insurer, and provide the insurer with basic information about the patient's condition, diagnoses, and course of treatment.

88.     After the CarePoint Hospitals became out-of-network providers, Horizon commenced a practice of giving written notification that it had denied coverage (albeit wrongfully) for emergency/urgent care patients while the patients were still in the hospital receiving emergency/urgent care.

89.     Horizon's ongoing practice of issuing in-hospital denials occurs before the patient's course of emergency/urgent treatment is complete, without the benefit of sufficient medical information or consultation with the attending physician and often without consultation with the attending physician at all.

90.     Horizon's in-hospital denials are arbitrary, capricious, and self-evidently unlawful.

91.     Horizon continues this unlawful practice to this very day.

92.     In addition to in-hospital denials, Horizon also routinely engages in in-hospital downgrades of coverage.

93.     Horizon's common practice in this regard is as follows:  While the patient is being treated in the hospital, Horizon sends formal correspondence to the attending physician and to the CarePoint Hospital's case management staff advising that Horizon has determined that the patient is "medically stable and [able to] be safely transferred to a par [*i.e.*, participating] facility for evaluation and continued care," although the patient is in fact not medically stable and should not be transferred.  Federal and state laws require that determinations of medical

stability and fitness for transfer be made by the patient's attending physician, not by a health insurer, like Horizon.

94.     Horizon's correspondence routinely advises that the patient's continued stay in the CarePoint Hospital will result in the remainder of the patient's stay being covered only at the patient's out-of-network rate, and that the patient "should be aware that, generally, when you elect to receive in-patient services from non-participating hospitals, you will incur substantially higher out-of-pocket financial liability because your out-of-network benefits apply, including higher deductible and coinsurance costs."

95.     This advice is given even though emergency services, whether rendered in an emergency room or following admission to the hospital, are not considered services "elected" by the patient but rather are services obtained because the patient, acting as a "prudent layperson," seeks immediate medical attention for a problem perceived to be a serious threat to a patient's life or continued health.

96.     Horizon's in-hospital downgrade letters are typically sent within twenty-four (24) hours after a patient has been admitted through the CarePoint Hospital's emergency department.

97.     Moreover, Horizon has deliberately structured its reconsideration procedures relevant to emergency/urgent cases to frustrate legitimate attempts to timely reverse the erroneous denials and downgrades described above.

98.     Specifically, Horizon only entertains one request for reconsideration of an in-patient denial per day, and only if made within three days after the denial.

99.     Thus, for example, if a patient is admitted on a Monday and Horizon erroneously denies the claim that day, the CarePoint Hospital may request reconsideration of Monday's admission no later than Thursday of the same week. If, on the Friday of that week, information is determined that validates the hospital's decision to admit the patient (for example, a test result), Horizon will not reconsider its denial for the preceding Monday – even though the hospital would now possess the relevant information to demonstrate that that denial is invalid.

100.    Instead, the hospital will then be forced to utilize Horizon's internal appeals process for the erroneously denied days, thus delaying payment.

**b.     Refusing to Make Direct Payments to the CarePoint Hospitals and Refusing to Provide Claims Information.**

101.    Despite the Horizon Subscribers' having executed the AOB Agreements that direct to the contrary, Horizon routinely sends payments for out-of-network services under some Plans directly to the Horizon Subscribers, particularly where the amount paid is $8,500 or less.

102.   Upon issuing a reimbursement check to a Horizon Subscriber, Horizon often fails to send an explanation of benefits ("EOB") to the provider – because doing so would alert the provider that the payment had been made directly to the Subscriber and would allow the provider to seek the appropriate payment from the Subscriber.

103.   Moreover, upon information and belief, many Horizon Subscribers do not cash the checks they receive from Horizon at all, out of fear that doing so would have some perceived adverse legal consequence or the belief that the check is a refund for premiums paid.  Other Horizon Subscribers do cash the checks, but do not remit payment to their providers out of confusion as to which provider is owed what amount.  Still other Horizon Subscribers fail to cash the check and fail to forward the check to any of their respective providers.  Still others cash the checks and later cannot be found.

104.   Horizon knows, or reasonably should know, that its practice of sending reimbursement checks to its Subscribers routinely prevents the CarePoint Hospitals from receiving payment for healthcare services rendered to patients who have health insurance with Horizon.  Moreover, that practice is prohibited by statute for fully insured plans (see N.J.S.A. 26:2S-6.1(c)) and is contrary to Department of Banking and Insurance's policy and guidance documents.

105.    Horizon also refuses to provide information to assist the CarePoint Hospitals in their efforts to collect on payments Horizon has made directly to Horizon Subscribers as the result of services rendered by the CarePoint Hospitals.

106.    Horizon's malfeasance in this regard has a direct financial benefit to Horizon.  Upon information and belief, Horizon books its issuance of a reimbursement check as an expense, helping Horizon to meet its minimum medical loss ratio, as is required by law.  Many of the checks, however, indicate that they are void after 180 days.  Upon the expiry of the 180 days if the check is not cashed, Horizon may book an increase in its cash reserves without correspondingly reducing the amount credited to its minimum medical loss ratio.

c. **Issuing and Refusing to Correct Erroneous EOBs or Process Appeals**

107.    In addition, Horizon has refused to properly pay claims – either directly to Horizon Subscribers or to the CarePoint Hospitals on the Subscribers' behalf – arising from emergency/urgent care, thus significantly delaying payment to the CarePoint Hospitals.

108.    When a Horizon Subscriber arrives at a CarePoint Hospital for emergency/urgent care, Horizon is required by state and federal law to limit the Subscriber's responsibility for payment to what the Subscriber would be responsible for had the Subscriber sought treatment from an in-network facility.

109.    The purpose of this requirement is to allow individuals to seek the most expeditious medical care possible when they are experiencing a medical emergency, without regard to the in-network or out-of-network status of the facility at which they are seeking emergency treatment.  Upon information and belief, Horizon reaffirms this obligation in member handbooks, benefit booklets, and similar documents provided to Subscribers.

110.    Notwithstanding these legal requirements, Horizon regularly fails to limit Subscriber responsibility to the amount the Subscriber would have paid had he or she received treatment from an in-network facility.  Instead, Horizon sends an EOB to the Subscriber reflecting that the Subscriber is obligated to pay the CarePoint Hospitals the difference between Horizon's "allowed" amount, and the balance of the CarePoint Hospitals' charges.  Thus, Horizon is in fact refusing to pay to CarePoint Hospitals' charges incurred by a Horizon Subscriber that Horizon is otherwise obligated to pay pursuant to its contract with that Subscriber, and under applicable law.

111.    In addition, Horizon has taken the position that in order for it to correct an erroneous determination of Subscriber responsibility (*e.g.* where the Subscriber presented as an emergency/urgent case but Horizon failed to honor its obligation to limit the Subscriber's responsibility to the same amount as they would have paid had they been treated at an in-network hospital), the CarePoint

Hospital must first "balance bill" the Subscriber for the amount that Horizon has erroneously determined to be the Subscriber's responsibility.  Here, Horizon places the burden on the CarePoint Hospitals even though Horizon readily acknowledges that its determination was erroneous in the first instance.

112.   Moreover, even after the CarePoint Hospital has issued a "balance bill" Horizon has refused to correct its erroneous determination.

113.   In short, Horizon's general practice is to force the CarePoint Hospitals to bill Horizon Subscribers for amounts that Horizon is actually required by law and contract to pay.

114.   Upon information and belief, the overarching purpose of this unlawful practice is to deter Horizon Subscribers from seeking care at the CarePoint Hospitals, even when the need for care is based on an emergency/urgent condition.

115.   As part and parcel of these obstructionist tactics, Horizon has unlawfully refused to take action with respect to appeals that the CarePoint Hospitals have lodged, including the most basic action of commencing the appeal process.

**J.    The CarePoint Hospitals Exhaust Available Internal Appeals Remedies.**

116.   Upon information and belief, all available appeals avenues under the Plans applicable to the claims at issue have either been exhausted or rendered futile by Horizon's refusal to process appeals.

117.   Upon information and belief, such Plans generally provide for administrative appeal of claim decisions to be processed by Horizon.  The CarePoint Hospitals routinely file such internal appeals with the result that Horizon adheres to its initial decision.

118.   For claims under Plans that are fully insured by Horizon, the Plans generally provide two levels of administrative appeals, both of which are internal appeals within Horizon.  The CarePoint Hospitals have timely requested such Level 1 and Level 2 internal appeals for the claims under the fully insured Plans at issue, with the exception of recent claims for which the CarePoint Hospitals have not yet received Horizon's initial claims decision or the time for filing a request for a Level 1, internal appeal has not yet expired.

119.   After the Level 1 and Level 2 internal Horizon appeals are exhausted, although not required by the Plans, CarePoint nonetheless routinely seeks further review from the New Jersey Department of Banking and Insurance ("DOBI") in an effort to avoid the need to seek judicial intervention.  However, since the CarePoint Hospitals have been out-of-network with Horizon, with the exception of a few claims, DOBI has refused to consider any of CarePoint's claims.  In some instances, DOBI has cited separate pending litigation between CarePoint and Horizon.  In others, DOBI has taken the position that "Provider appeals are not eligible for processing as stage 3 appeals."  As a result, all conceivable available

administrative remedies under the fully-insured Plans are effectively exhausted at the conclusion of the Level 2 internal appeal.

120.   What is more, nearly all of the claims under fully insured Plans for which the CarePoint Hospitals have completed the Level 1 and Level 2 internal appeals with Horizon have resulted in Horizon simply affirming its initial decision with little or no analysis.  Accordingly, it would be futile for the CarePoint Hospitals to continue to even pursue the Level 1 and Level 2 internal appeals process with Horizon for any further claims.

121.   Plans that are self-funded by the employer or other organization likewise include provisions for appealing claims decisions.  The CarePoint Hospitals obtain copies of the summary plan descriptions to identify the appeals process under the Plan that applies to each claim and routinely files appeals in accordance with the Plan's prescribed procedure.

122.   Like fully insured Plans, the self-funded plans typically provide for Level 1 and/or Level 2 internal appeals with Horizon and, where required, a Level 3 external appeal per the summary plan description or to the Department of Labor (ERISA).  The CarePoint Hospitals have timely requested such Level 1 and Level 2 internal appeals for the claims under the self-funded Plans at issue, with the exception of recent claims for which the CarePoint Hospitals have not yet received

Horizon's initial claims decision or the time for filing a request for a Level 1, internal appeal has not yet expired.

123.   With the exception of a few claims, the CarePoint Hospitals have been unable to file and prosecute Level 3 external appeals because Horizon has recently initiated a practice of sending its decision letter regarding the Level 2 appeals only to the Plan member with the result that the CarePoint Hospitals are denied prompt notice of the decision and must attempt to obtain copies of the decisions directly from the Plan member.  When the CarePoint Hospitals have been able to submit Level 3 external appeals, they have often been told summarily that providers are ineligible to submit such appeals.

124.   Again, nearly all of the claims under self-funded Plans for which the CarePoint Hospitals have completed the Level 1 and/or Level 2 internal appeals with Horizon have likewise resulted in Horizon simply affirming its initial decision with little or no analysis.  Accordingly, it would be futile for the CarePoint Hospitals to continue to seek Level 1 and Level 2 internal appeals with Horizon for any further claims.  Given the above, it would also be futile for the CarePoint Hospitals to continue to request Level 3 external appeals for future claims.

125.   Regardless of whether Horizon has conducted or refused to conduct the appeal procedures set forth in Horizon's own documents, Horizon has failed to fully reimburse the CarePoint Hospitals for the health care services they have

provided to Horizon Subscribers, and approximately $76.1 million remains due and owing to the CarePoint Hospitals for these services from June 1, 2015 to September 20, 2016.

126.    Moreover, Horizon has failed to adequately explain the basis for its dramatic underpayments to the CarePoint Hospitals.  In particular, Horizon has failed or refused to:  (a) provide the specific reason or reasons for the denial of claims; (b) provide the specific Plan provisions relied upon to support the denials; (c) provide the specific rule, guideline or protocol relied upon in making the decision  to  deny claims; (d) describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment code; and (e) notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits.

127.    The instant action is timely commenced well within four years after the CarePoint Hospitals were notified by Horizon that Horizon was rejecting or dramatically underpaying the CarePoint Hospitals' claims for reimbursement for the services that the CarePoint Hospitals provided to Horizon Subscribers, and otherwise within four (4) years after each of the CarePoint Hospitals' claims against Horizon accrued.

## CAUSES OF ACTION

### COUNT ONE
### (Breach of Plan Provisions for Benefits in
### Violation of ERISA § 502(a) (1) (B))

128.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

129.   The CarePoint Hospitals have standing to pursue claims under ERISA as the assignees and authorized representatives of the Horizon Subscribers' claims under the Plans.

130.   As the assignees of the Horizon Subscribers, the CarePoint Hospitals are entitled to reimbursement under the ERISA Plans for the hospital services provided to the Horizon Subscribers at the CarePoint Hospitals.

131.   Upon information and belief, the Plans did not prohibit the Horizon Subscribers from assigning their rights to benefits under the Plans to the CarePoint Hospitals, including the right of direct payment of benefits under the Plans to the CarePoint Hospitals.

132.   Moreover, to the extent that the Plans prohibited the assignment of benefits to the CarePoint Hospitals, Horizon has waived any purported anti-assignment provisions, has ratified the assignment of benefits to the CarePoint Hospitals, and/or is estopped from using any purported anti-assignment provisions against the CarePoint Hospitals due to Horizon's course of dealing with and

statements to the CarePoint Hospitals as out-of-network providers, discussed more fully above.

133.   Moreover, to the extent that the Plans prohibited the assignment of benefits to the CarePoint Hospitals, any such purported anti-assignment prohibitions are unenforceable as, among other things, contrary to public policy, as adhesion contracts, and/or due to a lack of privity with the CarePoint Hospitals.

134.   All of the Plans require reimbursement of medical expenses incurred by Horizon Subscribers at the rate of the CarePoint Hospitals' full billed charges (less in-network patient responsibility) for emergency/urgent care, and at the usual, customary, and reasonable rates for Elective care.

135.   The CarePoint Hospitals' billed charges represent the hospitals' usual, customary, and reasonable rates for the treatment provided to Horizon Subscribers.

136.   Horizon breached the terms of the Plans by refusing to make out-of-network reimbursements  for charges covered by the Plans, in violation of ERISA 502(a) (1) (B), 29 U.S.C. § 1132(a) (1) (B).  These breaches include, among other things, refusing to pay the CarePoint Hospitals' billed charges (less in-network patient responsibility) for emergency/urgent care that the CarePoint Hospitals provided to Horizon Subscribers; refusing to pay the CarePoint Hospitals the usual, customary, and reasonable charges for Elective care provided to Horizon subscribers; and otherwise refusing to pay the CarePoint Hospitals the amounts due

under the Plans for the medically necessary procedures and services performed at the CarePoint Hospitals.

137.   As a result of, among other acts, Horizon's numerous procedural and substantive violations of ERISA, any appeals are deemed exhausted or excused, and the CarePoint Hospitals are entitled to have this Court undertake a *de novo* review of the issues raised herein.

138.   Under 29 U.S.C. § 1132(a) (1) (B), the CarePoint Hospitals are entitled to recover unpaid/underpaid benefits from Horizon.  The CarePoint Hospitals are also entitled to declaratory and injunctive relief to enforce the terms of the Plans and to clarify their right to future benefits under such Plans, as well as attorneys' fees.

### COUNT TWO
**(Breach of Fiduciary Duties of Loyalty
and Due Care in Violation of ERISA)**

139.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

140.   Pursuant to 29 U.S.C. § 1132(a) (3), a civil action may be brought by "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

141.   The CarePoint Hospitals, as the assignees of ERISA members and beneficiaries under the Plans, are entitled to assert a claim for relief for Horizon's breach of fiduciary duties of loyalty and care and for failure to follow Plan documents under 29 U.S.C. § 1104(a)(1)(B) and (D).

142.   Horizon exercised discretion, control, authority and oversight in determining whether Plan benefits would be paid and the amounts of Plan benefits that would be paid.

143.   As an ERISA fiduciary, Horizon owed the CarePoint Hospitals a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character.  Further, as a fiduciary, Horizon was required to ensure that it was acting in accordance with the documents and instruments governing the Plans, and in accordance with ERISA § 404(a)(l)(B) and (D), 29 U.S.C. § 1104(a)(l)(B) and (D).   In failing to act prudently, and in failing to act in accordance with the documents governing the Plans, Horizon has violated its fiduciary duty of care.

144.   As a fiduciary, Horizon also owed the CarePoint Hospitals a duty of loyalty, defined as an obligation to make decisions in the interest of its beneficiaries and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with ERISA § 404(a) (l) (A),

29 U.S.C. § 1104(a) (l) (A) and ERISA § 406, 29 U.S.C. § 1106.  Thus, Horizon could not make benefit determinations for the purpose of saving money at the expense of the Horizon Subscribers.

145.   Horizon violated its fiduciary duty of loyalty to the CarePoint Hospitals by, among other things, refusing to make out-of-network reimbursements for hospital services provided at the CarePoint Hospitals for Horizon's own benefit and at the expense of Horizon Subscribers.  In addition, Horizon violated its fiduciary duty of loyalty by failing to inform the CarePoint Hospitals, as assignees of the Horizon Subscribers, of information material to the claims and Horizon's handling of the claims.

146.   The CarePoint Hospitals have standing to pursue claims under ERISA as assignees and authorized representatives of the Horizon Subscribers.

147.   The CarePoint Hospitals are entitled to relief to remedy Horizon's violation of its fiduciary duties under ERISA § 502(a) (3), 29 U.S.C. § 1132(a) (3), including declaratory and injunctive relief.

## COUNT THREE
### (Denial of Full and Fair Review in Violation of ERISA § 503)

148.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

149.   As assignees and authorized representatives of the Horizon Subscribers' claims, the CarePoint Hospitals are entitled to receive protection under ERISA, including (a) a "full and fair review" of all claims denied by Horizon; and (b) compliance by Horizon with applicable claims procedure regulations.

150.   Although Horizon is obligated to provide a "full and fair review" of denied claims pursuant to ERISA § 503, 29 U.S.C. § 1133 and applicable regulations, including 29 C.F.R. § 2560.503-1 and 29 C.F.R. § 2590.715-2719, Horizon has failed to do so by, among other actions:

a.    refusing to provide the specific reason or reasons for the denial of claims;

b.    refusing to provide the specific Plan provisions relied upon to support its denial;

c.    refusing to provide the specific rule, guideline or protocol relied upon in making the decision to deny claims;

d.    refusing to describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment code;

e.    refusing to notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits; and

      f.     refusing to provide a statement describing any voluntary appeals procedure available, or a description of all required information to be given in connection with that procedure.

151.   By failing to comply with the ERISA claims procedure regulations, Horizon failed to provide a reasonable claims procedure.

152.   Because Horizon has failed to comply with the substantive and procedural requirements of ERISA, any administrative remedies are deemed exhausted pursuant to 29 C.F.R. § 2560.503-1(l) and 29 C.F.R. § 2590.715-2719(b) (2) (ii) (F) (1).  Exhaustion is also excused because it would be futile to pursue administrative remedies, as Horizon does not acknowledge any basis for its denials and thus offers no meaningful administrative process for challenging its denials.

153.   The CarePoint Hospitals have been harmed by Horizon's failure to provide a full and fair review of appeals submitted under ERISA § 503, 29 U.S.C. § 1133, and by Horizon's failures to disclose information relevant to appeals and to comply with applicable claims procedure regulations.

154.   The CarePoint Hospitals are entitled to relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including declaratory and injunctive relief, to remedy Horizon's failures to provide a full and fair review, to disclose information relevant to appeals, and to comply with applicable claims procedure regulations.

## COUNT FOUR
### (Breach of Contract – non-ERISA)

155.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

156.   To the extent that some of the Plans are not employee welfare benefit plans governed by ERISA, they are nonetheless valid and enforceable insurance contracts.

157.   As set forth more fully above, upon information and belief, all of the Plans require reimbursement of medical expenses incurred by Horizon Subscribers at usual, customary, and reasonable rates.  Further, under the terms of the Plans, Horizon Subscribers are entitled to coverage for the services that they received from the CarePoint Hospitals.

158.   By virtue of the AOB Contracts executed by Horizon Subscribers, the CarePoint Hospitals were assigned the right to receive reimbursement under the Plans for the services rendered to the Horizon Subscribers.  Pursuant to said AOB Contracts, Horizon is contractually obligated to reimburse the CarePoint Hospitals for these services.

159.   Horizon failed to make payment of benefits to the CarePoint Hospitals in the manner and amounts required under the terms of the Plans.

160.   As the result of Horizon's failures to comply with the terms of the Plans, the CarePoint Hospitals, as assignees, have suffered damages and lost

benefits for which they are entitled to recover damages from Horizon, including

unpaid benefits, restitution, interest, and other contractual damages sustained by

the CarePoint Hospitals.

## COUNT FIVE
### (Breach of the Duty of Good Faith and
### Fair Dealing – non-ERISA)

161.   The foregoing allegations are re-alleged and incorporated by

reference as if fully set forth herein.

162.   As set forth more fully above, if any of the Plans are not employee

welfare benefit plans governed by ERISA, they are nonetheless valid and

enforceable insurance contracts.  As such, the Plans contain an implied duty of

good faith and fair dealing.

163.   Horizon, as the obligor under the Plans, owed the Horizon Subscribers

a duty of good faith and fair dealing with respect to said Plans.

164.   As set forth more fully above, the Horizon Subscribers received health

care services at the CarePoint Hospitals and executed AOB Contracts, among

other documents, in which they assigned to the CarePoint Hospitals their right to

benefits under the Plans for the services that the CarePoint Hospitals provided to

the Horizon Subscribers.

165.   By virtue of these assignments, Horizon also owes this duty of good

faith and fair dealing to the CarePoint Hospitals.

166.   Horizon breached its duty of good faith and fair dealing owed to the CarePoint Hospitals, as assignees of rights and benefits under the Plans, in a number of ways, described more fully above.

167.   Moreover, N.J.S.A. § 17:29B-3, et seq., defines the public interests of New Jersey and prohibits unfair methods of competition and unfair or deceptive acts or practices in the business of insurance.

168.   Without limitation, Horizon's breaches include, but are not limited to, Horizon:

a.   using unilaterally and arbitrarily selected percentages of Medicare or in-network rates in determining amounts it will pay to out-of-network providers for emergency/urgent care provided to Horizon Subscribers, when Horizon's liability for the full charges was reasonably clear;

b.   failing to provide the CarePoint Hospitals with adequate written explanations for the failure to reimburse all or a portion of the CarePoint Hospitals' claims for the services provided to Horizon Subscribers;

c.   failing to reimburse the CarePoint Hospitals' charges for the health care services provided to Horizon Subscribers, and failing to provide adequate written explanations for the refusal to pay all or a portion of such claims, within the statutorily prescribed time frames;

d.  using arbitrary methodology for determining whether to reimburse and, if so, the amount to reimburse the CarePoint Hospitals for the services the CarePoint Hospitals provided to Horizon Subscribers;

e.  providing patently inadequate explanations for its under-reimbursement of the CarePoint Hospitals;

f.  not attempting in good faith to effectuate prompt, fair and equitable settlement of claims for which liability had become reasonably clear;

g.  compelling the CarePoint Hospitals to institute litigation to recover amounts due under the Plans by refusing to pay claims properly;

h.  failing to promptly provide a reasonable explanation of the basis in the Plans in relation to the facts or applicable law for nonpayment and underpayment of the CarePoint Hospital's claims;

i.  violating applicable statutory and regulatory provisions governing the business of insurance;

j.  committing unfair and deceptive acts and practices in handling the CarePoint Hospitals' claims;

k.  making use of funds which should have been paid to the CarePoint Hospitals pursuant to their claims for benefits under the Plans; and

l.   ignoring its own ethical standards and claims-handling procedures, which require that a claims-handler discover and disclose all bases for finding – not avoiding – insurance coverage.

169.   Horizon's conduct in derogation of its duty of good faith and fair dealing under the Plans has deprived the CarePoint Hospitals of their reasonable expectations and benefits as assignees of benefits under the Plans.

## COUNT SIX
### (Declaratory Judgment - 28 U.S.C. §2201)

170.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

171.   This is a count for declaratory relief pursuant to 28 U.S.C. § 2201.

172.   Horizon claims that the Plans may be interpreted as permitting Horizon to unilaterally and arbitrarily establish an allowed amount that it will pay for claims for treatment provided by out-of-network providers.

173.   Upon information and belief, none of the Plans allows Horizon to unilaterally and arbitrarily establish allowed amounts payable with respect to treatment provided by out-of-network providers.

174.   Likewise, on information and belief, none of the Plans contains any formula or other methodology for determining an "allowed amount" that is payable under the Plan with respect to treatment provided by out-of-network providers.

175.   Under New Jersey law, insurers who provide coverage for emergency/urgent care and receive a claim for emergency/urgent care provided by an out-of-network hospital are required to pay an amount sufficient to protect the patient/insured from being balance billed.  To protect its insureds against balance billing, an insurer may (a) pay the full amount of the charges, (b) negotiate a settlement of the claim with the provider or (c) negotiate an in-network agreement with the provider.  *Aetna Health, Inc. v. Srinivasan,* 2016 N.J. Super. Unpub. LEXIS 1515 (App. Div., June 29, 2016).  The insurer may not unilaterally and arbitrarily decide whether it will pay the out-of-network provider's claim and, if so, how much of the claim it will pay.

176.   As a direct and proximate result of Horizon's acts and omissions, including, but not limited to, its use of a non-disclosed, arbitrary methodology to calculate "allowed amounts" it will pay for treatment provided by out-of-network providers, failure to comply with the terms of the Plans and statutory requirements to pay claims timely, the CarePoint Hospitals have sustained and will continue to sustain damages and have been deprived of and will continue to be deprived of the compensation to which they are entitled for providing covered hospital services to Horizon Subscribers.

177.   The existence of another potentially adequate remedy does not preclude a judgment for declaratory relief.  *See* Federal Rules of Civil Procedure, Rule 57.

178.   The CarePoint Hospitals are entitled to supplemental relief pursuant to 28 U.S.C. § 2201, including the payment of all money that was not paid by Horizon to the CarePoint Hospitals for providing the covered hospital services described in this Complaint.

## COUNT SEVEN
### (Breach of Fiduciary Duty – non-ERISA)

179.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

180.   At all relevant times, Horizon was the plan administrator, fiduciary, relevant party-in-interest, and/or the obligor for the Plans.  As such, even if some of the Plans are not employee welfare benefit plans governed by ERISA, Horizon nonetheless owed and owes the Horizon Subscribers fiduciary duties under the Plans.

181.   As set forth more fully above, Horizon Subscribers have received health care services at the CarePoint Hospitals and executed AOB Contracts, among other documents, in which they assigned to the CarePoint Hospitals all

rights to benefits under the Plans for the services that the CarePoint Hospitals provided to the Horizon Subscribers.

182.   By virtue of these assignments, Horizon also owed and owes this fiduciary duty to the CarePoint Hospitals, as the assignees of beneficiaries under the Plans.

183.   As set forth more fully above, upon information and belief, the Plans did not prohibit Horizon Subscribers from assigning their rights to benefits under the Plans to the CarePoint Hospitals, including the right of direct payment of benefits under the Plans to the CarePoint Hospitals.

184.   Moreover, as set forth more fully above, to the extent that the Plans prohibited the assignment of benefits to the CarePoint Hospitals, Horizon has waived any purported anti-assignment provisions, has ratified the assignment of benefits to the CarePoint Hospitals, and/or is estopped from using any purported anti-assignment provisions against the CarePoint Hospitals due to its course of dealing with and statements to the CarePoint Hospitals as out-of-network providers, discussed more fully above.

185.   Moreover, as set forth more fully above, to the extent that the Plans prohibited the assignment of benefits to the CarePoint Hospitals, any such purported anti-assignment prohibitions are unenforceable as, among other things,

contrary to public policy, as adhesion contracts, and/or due to a lack of privity with the CarePoint Hospitals.

186.   Horizon breached the fiduciary duties owed to the CarePoint Hospitals in a number of ways, described more fully above.

187.   As the result of Horizon's violations of its fiduciary duties to the CarePoint Hospitals, the CarePoint Hospitals have suffered, and continue to suffer, substantial damages.

## COUNT EIGHT
### (Quantum Meruit)

188.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

189.   The CarePoint Hospitals have conferred upon Horizon the benefit of providing treatment to Horizon Subscribers.

190.   At the times the CarePoint Hospitals treated the Horizon Subscribers, the CarePoint Hospitals reasonably expected remuneration from Horizon in the form of the full billed charges minus any applicable patient responsibilities.

191.   By underpaying the CarePoint Hospitals for the treatment that the CarePoint Hospitals provided to Horizon Subscribers, Horizon has been unjustly enriched.

192.   As the result of Horizon's unlawful, unjust and wrongful acts, the CarePoint Hospitals suffered and continue to suffer damages, and they are owed restitution from Horizon.

## COUNT NINE
### (Promissory Estoppel)

193.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

194.   Horizon represented to the CarePoint Hospitals that the medical treatment sought by the Horizon Subscribers as patients at the CarePoint Hospitals was a covered procedure under the Plans, and that the fees associated with that treatment were covered charges under the Plans.   Based on Horizon's statements that the patients seeking medical care and treatment had active coverage and benefits, the CarePoint Hospitals reasonably understood that some payment would be forthcoming for the hospital services provided at the CarePoint Hospitals related to these procedures.

195.   The CarePoint Hospitals provided hospital services to Horizon Subscribers in reliance on Horizon's statements regarding coverage and benefits.

196.   The CarePoint Hospitals relied upon Horizon's representations, authorizations, and promises to their detriment.

197.   This reliance was foreseeable, as Horizon's representations were made in the context of telephone calls from the CarePoint Hospitals' billing agents

to verify, confirm, and pre-certify coverage prior to the hospital services being provided, and there was no ability for the CarePoint Hospitals to learn, separate and apart from Horizon's representations, whether Horizon considered the fees related to these hospital services to be covered charges under the relevant Plans.

198.   Horizon is now estopped from denying full and complete payment for the claims at issue in this Complaint.

199.   As a result of the CarePoint Hospitals' reliance on Horizon's statements, the CarePoint Hospitals have suffered and continue to suffer injury, including money damages, and injustice can only be avoided by Horizon honoring its previous promises.

## COUNT TEN
### (Temporary and Permanent Injunctive Relief)

200.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

201.   Currently, Horizon is wrongfully denying payment in whole or in part for virtually all claims for benefits submitted for hospital services provided to Horizon Subscribers by the CarePoint Hospitals as out-of-network providers.  In so doing, Horizon has failed and is failing to comply with the terms of the Plans and its other obligations, including its obligations under ERISA.

202.   Unless enjoined from doing so, Horizon will continue not to comply with the terms of the Plans and its other obligations, including under ERISA, to the

CarePoint Hospitals' severe detriment. A monetary judgment in this case will only compensate the CarePoint Hospitals for past losses, and will not stop Horizon from continuing to confiscate the money earned by the CarePoint Hospitals and necessary to maintain their medical facilities. The CarePoint Hospitals have no practical or adequate remedy, either administratively or at law, to avoid these future losses.

203.  The CarePoint Hospitals are entitled to a preliminary and permanent injunction requiring Horizon to process claims for hospital services provided to Horizon Subscribers at the CarePoint Hospitals in accordance with the terms of the Plans, and requiring Horizon to stop summarily denying claims for medically-necessary services provided by the CarePoint Hospitals to Horizon Subscribers.

## CONDITIONS PRECEDENT

204.  All conditions precedent have been performed or have occurred.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the CarePoint Hospitals hereby request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the CarePoint Hospitals demand judgment in their favor against Horizon as follows:

A.      Declaring that Horizon has breached the terms of the Plans with regard to out-of-network benefits and awarding damages for unpaid out-of-network benefits, as well as awarding injunctive and declaratory relief to prevent Horizon's continuing actions detailed herein that are unauthorized by the Plans;

B.      Declaring that Horizon failed to provide a "full and fair review" under § 503 of ERISA, 29 U.S.C. § 1133, and applicable claims procedure regulations, and that "deemed exhaustion" under such regulations is in effect as a result of Horizon's actions, as well as awarding injunctive, declaratory and other equitable relief to ensure compliance with ERISA and its claims procedure regulations;

C.      Declaring that Horizon violated its fiduciary duties under § 404 of ERISA, 29 U.S.C. § 1104, and awarding injunctive, declaratory and other equitable relief to ensure compliance with ERISA;

D.      Declaring that under New Jersey law, Horizon is obligated to pay out-of-network providers for emergency/urgent care rendered to Horizon Subscribers and that Horizon may not refuse to pay or delay paying such claims, unilaterally and arbitrarily set an "allowed amount" it will pay on such claims, or otherwise unilaterally and arbitrarily reduce its obligation to pay for such claims;

E.      Awarding damages based on Horizon's misrepresentations and nondisclosures regarding the existence of benefits for these hospital services based on promissory estoppel, including any exemplary damages permitted by law;

F.      Temporarily and permanently enjoining Horizon from continuing to pursue its actions detailed herein, and ordering Horizon to pay benefits in accordance with the terms of the Plans and applicable law;

G.      Awarding lost profits, contractual damages, and compensatory damages in such amounts as the proofs at trial shall show;

H.      Awarding exemplary damages for Horizon's intentional and tortious conduct in such amounts as the proofs at trial will show;

I.      Awarding restitution for reimbursements improperly withheld by Horizon;

J.      Declaring that Horizon has violated the terms of the relevant Plans and/or policies of insurance covering the Horizon Subscribers;

K.      Requiring Horizon to make full payment on all previously denied charges relating to the Horizon Subscribers;

L.      Requiring Horizon to pay the CarePoint Hospitals the benefit amounts as required under the Plans;

M.      Awarding reasonable attorneys' fees, as provided by common law, federal or state statute, or equity, including § 502(g) of ERISA, 29 U.S.C. § 1132(g);

N.      Awarding costs of suit;

O.      Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or rule, or equity; and

P.      Awarding all other relief to which Plaintiffs are entitled.

Respectfully submitted,

**K&L GATES, LLP**

By: /s/ Anthony P. La Rocco
Anthony P. La Rocco
anthony.larocco@klgates.com
George P. Barbatsuly, Esq.
george.barbatsuly@klgates.com

One Newark Center, 10th Floor
Newark, New Jersey 07102
(973) 848.4104  Telephone
(973) 556.1584 Facsimile

***Attorneys for Plaintiffs***
Hudson Hospital OPCO, LLC--d/b/a CarePoint Health--Christ Hospital, IJKG, LLC, IJKG PROPCO LLC and IJKG OPCO LLC d/b/a CarePoint Health--Bayonne Medical Center, and HUMC OPCO LLC d/b/a CarePoint Health--Hoboken University Medical Center

September 26, 2016